HOUSTON, Justice.
In June 1990, faced with reduced funding due to proration of the state’s education budget, the Huntsville City Board of Education, upon the recommendation of its superintendent, Dr. Mary Jane Caylor, froze scheduled pay increases that it had implemented for the benefit of its employees in 1989 as part of a “Master Compensation Plan.” The freeze was extended in June 1991, as a result of further cuts in anticipated revenue from the state. In September 1991, the Huntsville Education Association, Inc., and two of its members, Jacqueline Phillips and Ray Sanford (unless otherwise specified, these parties are hereinafter referred to as “the Association”), sued the Huntsville City Board of Education and Dr. Caylor[1] (unless otherwise specified, these parties are hereinafter referred to as “the Board”), seeking to set aside the pay freeze. The Association, which sought, among other things, an award of back pay for its members, took the position that the pay freeze had been enacted in violation of Ala.Code 1975, § 16-11-18, and that it was in contravention of Board policy because, the Association said, the matter had not been first submitted to the Board’s “Policy Committee” for review. The trial court held that the Board had consulted with the Association pursuant to § 16-11-18 and that its action in that regard did not violate established Board policy. The court entered a summary judgment for the Board. The Association appealed. We affirm.
Section 16-11-18 provides:
“The city board of education shall, upon the written recommendation of the city superintendent of education, determine and establish a written educational policy for the city and shall prescribe rules and regulations for the conduct and management of the schools. Before adopting written policies, the board shall directly, or indirectly through the superintendent, consult with the professional organization representing the majority of the certified employees and in addition shall also consult with professional assistants, principals, teachers, and interested citizens. The city board must establish such policies and adopt such rules and regulations and file them with the state superintendent of education. Such written policies, rules and regulations so established, adopted, or promulgated shall be made available to all teachers employed by the city board. Any subsequent amendments to such policies, rules and regulations shall be developed in the same manner, filed with the state superintendent and furnished to the teachers employed by the *412 local board within 20 days after adoption thereof.”
(Emphasis added.)
This section does not specify any particular procedure by which the Board was supposed to consult with the Association, which undisputably is the “professional organization representing the majority of the certified employees.” Furthermore, both the Board and the Association agree that § 16-11-18 obligated the Board only to consult with those professional organizations and persons mentioned therein; it did not obligate the Board to reach any agreement, accept any proposal, or negotiate any matter if it did not wish to do so. See Walker County Board of Education v. Walker County Education Association, 431 So.2d 948 (Ala.1983) (dealing with § 16-8-10, the counterpart to § 16-11-18, applicable to county boards of education).
The undisputed evidence shows that the Board, through Dr. Caylor, met with the Association’s president, Laura Hall, and discussed the proposed pay freeze with her before its initial implementation in 1990 and before its extension in 1991. Ms. Hall testified, in pertinent part, as follows:
“Q. ... Did you know prior to the June 6, 1990, meeting that on the agenda was a recommendation to freeze step increases?
“A. Prior to the June 1990, meeting, yes.
“Q. How did you know that?
“A. There had been much discussion about that at the board work sessions. I think it was April when it was first mentioned.
“Q. You said there had been much discussion, been much discussion among board members and the superintendent?
“A. As well as members of the association, yes.
“Q. Been a lot of discussion within the association about it?
“A. Yes.
“Q. Had there been much discussion by representatives of the association with Dr. Caylor?
“A. By representatives of the association—
“Q. Yeah.
“A. Including—
“Q. Including you.
“A. Including me. Yeah. I’m sure at our monthly meetings.
“Q. Had you, at your regular monthly meetings, you or other representatives of the association given Dr. Caylor your point of view with respect to this proposed recommendation and told her what you thought about it whether it was a good idea or bad idea or whatever?
“A. Before. I don’t recall giving any association’s position on—
“Q. Well, whether its the association’s position or not at these monthly meetings, had you or any other representative of the association told Dr. Caylor what you thought about this proposed recommendation, this idea of freezing the step increases?
“A. Oh, yeah.
“Q. And that would have occurred between April 1990, and June 1990, in that time frame before the June 6, 1990, meeting?
“A. Yes.
[[Image here]]
“Q. Prior to this meeting, what did you tell the Board of Education and the superintendent? What did you tell them regarding this recommendation?
“A. Regarding the recommendation of freeze on salaries?
“Q. Uh-huh.
“A. The only comment that I recall that I made as it relates to the freeze on the salary at a board meeting was during a work session and when the idea was presented about the freeze that if it was a choice between the freeze and termination of employment I think that it was my feeling that I would say freeze.
“Q. You would prefer a freeze?
“A. Right.
*413 “Q. And you said this at a work session?
“A. Yes, I did.
“Q. To the members of the board and the superintendent?
“A. Right.
“Q. And this would have been sometime after April and prior to June 1990?
“A. I think whenever the idea was first presented.
“Q. Sometime prior to June 1990?
“A. Sure.
“Q. The idea of a freeze in step increases?
“A. Yes.
“Q. Let me show you what I’ve marked as Defendant’s Exhibit B and ask you to look at that please. Let me also [write ‘HEA’ on that exhibit]. Laura, can you identify HEA Exhibit B, Defendant’s exhibit HEA B?
“A. It’s an agenda.
“Q. It purports to be an agenda of the June 4, 1991, meeting; is that correct?
“A. Uh-huh.
“Q. Did you receive, in your position as president of HEA, did you receive ... this agenda in advance of the meeting?
“A. Yes.
[[Image here]]
“Q. ... Did you know prior to the June 4, 1991, meeting that included within the recommendations of the superintendent was another recommendation to freeze the step increases?
“A. Yes.
“Q. Was there discussion of that at HEA?
“A. Yes.
“Q. Did you discuss it with Cathy Kulas [Ms. Hall’s successor]?
“A. I’m sure I did, yes. I don’t recall, but I—
[[Image here]]
“Q. Did you know prior to the time you left office in [May] 1991, that the superintendent was considering extending the freeze on step increases?
“A. Yes.
“Q. Prior to the time you left office in May 1991, did you discuss that with the superintendent?
“A. The salary freeze?
“Q. Yeah. An extension of the step increase freeze.
“A. I would think yes. I mean we discussed it a number of times.
“Q. You discussed it a number of times with her?
“A. Yes.
“Q. Did you tell Dr. Caylor your position with respect to the extension of the freeze in step increases?
“A. We discussed it. I’m sure I did.
“Q. Well, Laura, do you have any doubt that Dr. Caylor knew that HEA opposed the freeze in step increases?
“A. Do I have any doubt that she knew?
“Q. Uh-huh.
“A. I don’t think she had any doubt about our position, no.
“Q. You don’t think she had any doubt whatsoever about what ... the HEA’s position [was] with respect to the freeze in step increases?
“A. No. Right. I don’t think so.
“Q. You don’t think any member of the board had any doubt whatsoever with respect to the position of HEA regarding the freeze in step increases?
“A. Right.
“Q. You don’t think there was any doubt in anybody’s mind, do you?
“A. No.
“Q. And they would have known the position of HEA prior to the meeting of June 4, 1991?
“A. Both Dr. Caylor and the board?
“Q. Yes.
“A. Yes.”
This testimony clearly shows that the Board was aware when it implemented *414 and later extended the pay freeze that the Association opposed it. The Board argues that because the undisputed evidence establishes that it consulted with the Association before implementing the pay freeze, § 16-11-18 was satisfied and the summary judgment was proper. The Association argues, however, that § 16-11-18 was nonetheless violated because, it says, the Board failed to consult with others designated in the statute before it implemented the pay freeze. After carefully reviewing the record, we do not read the Association’s complaint as specifically alleging that the Board failed to consult with others named in the statute. The Board states in its brief that if the Association had alleged that others designated in § 16-11-18 had not been consulted, then it would have produced evidence establishing its full compliance with the requirements of the statute. It appears to us that the sole issue below was whether the Board had consulted with the Association. It is so well settled as to require no citation to authority that we cannot consider arguments raised for the first time on appeal.
Relying on Walker County Board of Education v. Walker County Education Association, supra, in which this Court held that a school board must abide by its own duly enacted policies, the Association also argues that the Board had adopted a policy of submitting all proposed policy changes (such as a pay freeze) to a “Policy Committee” made up of “representatives from the professional organization representing the majority of certified employees, teachers, principals, support personnel, interested citizens, and other persons,” and that the Board failed to do that when it implemented the pay freeze in this case. The Board acknowledges that a “Policy Committee” does exist from which it can secure input, advice, counsel, and recommendations relative to proposed policies or proposed policy modifications and that the pay freeze proposal was not submitted to the “Policy Committee”; however, the Board insists that that committee was never intended to be the sole means by which it could receive input from interested persons or organizations regarding Board policy.
The evidence with respect to this issue shows that in 1973 the Board adopted the following policy entitled “Determination and Adoption of Policies”:
“The Huntsville City Board of Education shall determine and adopt policies in accordance with procedures which it will establish in order to facilitate the broadest possible consultation with elements of the school district, including employees of the district who may have special knowledge of, or particular interest in, the policy consideration. These policies, once adopted, shall serve as guidelines for the superintendent and other employees in the administration and operation of the Huntsville City School System and its educational program.”
A procedure implemented in connection with that policy provided, in pertinent part, as follows:
“Formulation of Policies. Policies may be proposed for adoption, amendment or repeal at any Board meeting by any member of the School Board or by the superintendent. It shall be the responsibility of the superintendent, when preparing such recommendations, to confer with principals, teachers, the professional organization representing the majority of the certified employees, and any others as deemed necessary.”
Approximately six years later, in 1979, the Board adopted the following policy authorizing the creation of a “Policy Committee”:
“A Policy Committee shall be established by the Superintendent for the purpose of securing input, advice, counsel, and recommendations relative to proposed policies or proposed policy revisions and implementing regulations.
“The Policy Committee membership shall include representatives from the professional organization representing the majority of certified employees, teachers, principals, support personnel, interested citizens, and other persons.
*415 “The Policy Committee shall be convened as determined by the Superintendent except that no fewer than two meetings shall be held during each school year.”
(Emphasis added.) A written procedure was also implemented in 1979 declaring the exact composition of the committee, providing for a support staff to assist the committee, and setting out the basic framework within which the committee was to operate. That statement of procedure provided in pertinent part:
“The Policy Committee will meet at least twice in each year. In addition, the Superintendent or the chairperson may call a meeting at any time to deal with policy development in the system.”
(Emphasis added.) In addition, the statement of procedure referred to the following “policy development chart”:
[[Image here]]
The evidence also shows that in 1987 a consent order was entered in the Madison County Circuit Court concluding a lawsuit between the Huntsville Education Association and some of its members and the Huntsville City Board of Education regarding the manner in which Board policy and procedures were to be adopted. That order reads, in pertinent part, as follows:
“The parties have now come before this Court indicating their agreement regarding entry of the following order.
[[Image here]]
“Procedure Number 100-10P of the Huntsville City Schools shall be amended by adding the following subsection:
“F. Absent circumstances considered by the Superintendent to be of an emergency nature, at least five (5) working days prior to its presentation to the Policy Committee the Superintendent shall provide all members of the Policy Committee notice of any proposed change, including deletion or alteration of a policy. In the event such an emergency occurs, the Superintendent shall try to contact the President of the Huntsville Education Association prior to the Policy Committee meeting to explain the proposed policy and the nature of the emergency.
“Because the Policy Committee, established under Huntsville City Schools’ *416 Policy Number 100-10 and Procedure Number 100-10P, is the Board’s vehicle for compliance with the consultation statute, Section 16-11-18, Ala.Code, the Huntsville Education Association shall continue to have the right to appoint its designated number of places to the Policy Committee.”
(Emphasis added.) The Association maintains that the emphasized language above, which was agreed to by Dr. Caylor, is a clear indication that the Board had a policy of submitting all proposed policies and policy modifications to the “Policy Committee.” Other evidence shows, however, that approximately a year and a half after this consent order was entered, the Board adopted the “Master Compensation Plan” previously referred to. This comprehensive plan replaced the Board’s existing salary plan. The new salary plan, which resulted in a pay increase for all employees, was not submitted to the “Policy Committee” for review. Dr. Caylor consulted with Ms. Hall before the implementation of the new plan, and the Association supported the adoption of the plan. Later, the Board amended the new salary plan by increasing the salary of teachers. Again, the Association approved the policy change, even though it was made without input from the ■ “Policy Committee.” The evidence further shows that other policies (e.g., an affirmative action plan and a worker’s compensation plan) were adopted by the Board without the input of the “Policy Committee.” Cathy Kulas, the current president of the Association, acknowledged during her deposition that not all proposed policies are submitted to the Policy Committee, but stated that it was her understanding that they are supposed to be. Dr. Caylor, one of the chief negotiators of the agreement that was ultimately embodied in the consent order, testified that she did not consider herself bound to consult with the “Policy Committee.” She explained the Board’s policy and the language in the consent order as follows:
“Q. Yes, ma’am. I’m just asking you what is your understanding of § 16 — 11— 18. What it requires of a superintendent of a city board of education?
“A. It requires that before the adoption of any written policy that the board shall consult with professional organizations representing the majority of certified employees, professional assistants, principals, teachers, interested citizens, and others through the superintendent. It’s a consultation section that directs how a policy is adopted for the school system.
“Q. And in the consent order the language I read the parties agree there that the policy committee serves as a vehicle for compliance with the consultation statute?
[[Image here]]
“A. No, it does not say that. It says that the — nowhere in the statute does it say anything about the policy committee.
“Q. That’s correct.
“A. Okay. It simply says that the board shall directly or indirectly through the superintendent consult with all of these individuals that I have named. The statement that you’re referring to in this consent order is stating that this policy and procedure appoints the members to serve on the policy committee not be changed. I was considering at that time, in fact I think I had already put it in place, that I would appoint all the members of the policy committee and there was great objection to that by [the Association].... [T]hey felt that they should have that right reserved to the president of the organization and if you will look at that policy and that procedure it delineates how members are thereby appointed to the policy committee but nowhere in the Code of Alabama nor do I construe that consent order to say that I have to consult with the policy committee per se. It does not say that to me. It says I must consult with all of those people, which I did numerous times. I don’t construe it that way_ That I think is referring to the overall structure of the policy committee and how they are appointed, but not that I must consult with the policy committee. I consult with more persons [than] serve on the policy committee.”
*417 In addition, the following letter from Dr. Caylor to Dene Hamby, Ms. Hall’s predecessor as president of the Association, was introduced as evidence tending to show that submission of all policy matters to the “Policy Committee” was not considered by Caylor and Hamby to be mandatory:
“While the basic vehicle for compliance with the consultation statute will continue to be the Policy Committee, I agree to meet monthly with the President of the Huntsville Education Association and his or her designee to discuss proposed policy changes or other subjects raised by the Huntsville Education Association. If such a monthly meeting cannot be held prior to the consideration of a proposed policy change by the Board of Education, I agree to make the President of Huntsville Education Association aware of such proposal either in person or by telephone; provided that if the proposed policy change is addressed by the Policy Committee, this shall be sufficient to comply with the consultation statute.”
After carefully reviewing the undisputed evidence in this case, we conclude that the Board adopted a policy whereby important new policy proposals and proposed policy modifications could be submitted to a “Policy Committee” for a recommendation. We find it significant that the “Policy Committee” was not created until 1979 and that the membership of the “Policy Committee” includes the same organizations or groups designated in § 16-11-18. Thus, it is reasonable to assume that the Board contemplated that it could use the “Policy Committee” as a more efficient means by which to comply with § 16-11-18. However, as those portions of the policy manual previously set out show, submission of policy matters to the “Policy Committee” is discretionary with the superintendent. No mandatory language appears in the manual. Other than two mandatory meetings a year, there is no requirement that the superintendent convene the “Policy Committee.” The only requirement is that § 16-11-18 be complied with. Our conclusion as to the discretionary nature of the “Policy Committee” is supported by the fact that subsequent to its creation, the “Policy Committee” was not viewed by the Board, Dr. Caylor, or the Association as an indispensable part of the policy-making process. We note that Ms. Kulas testified that she understood that all policy matters were supposed to be submitted to the “Policy Committee.” However, given the clear wording of the policy manual, as well as the course of conduct of the parties, we do not view her testimony as sufficient to create a fact question as to whether all policy matters had to be submitted to the “Policy Committee.”
Because the undisputed evidence shows that the Board did not violate its own policy when it consulted directly with the Association before implementing the pay freeze in 1990, and later extending it in 1991, the summary judgment for the Board was proper.[2]
AFFIRMED.
HORNSBY, C.J., and MADDOX, SHORES and INGRAM, JJ., concur.

. Dr. Ron Saunders, who succeeded Dr. Caylor as the superintendent, was later substituted for Dr. Caylor as a defendant.

. Because of its direct input into the decision-making process, we question the Association’s standing to even challenge the pay freeze; however, a determination of this issue was not necessary to a resolution of this case.